**\*NOT FOR PUBLICATON\***

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

ENVOY TECHNOLOGIES, INC.,

Plaintiff,

v.

NORTHROP GRUMMAN CO.,

Defendant.

No. 19-13976 (FLW)

**OPINION**

**<u>WOLFSON, Chief Judge:</u>**

Plaintiff Envoy Technologies Inc. ("Plaintiff" or "Envoy") sues Defendant Northrop Grumman Corporation ("Defendant" or "Northrop") for alleged unauthorized use of its computer software product. Envoy initially asserted five causes of action in its First Amended Complaint, including: (1) fraud; (2) infringement; (3) breach of contract; (4) misappropriation; and (5) unjust enrichment. The Court granted Defendant's motion to dismiss as to the claims for fraud, misappropriation, and unjust enrichment. Plaintiff later amended its complaint; the Second Amended Complaint ("SAC") brought two separate causes of action for copyright infringement under U.S. and United Kingdom copyright law, respectively, and a single cause of action for breach of contract. In the present matter, the parties cross move for summary judgment on the breach of contract and infringement claims. Although Defendant moved to dismiss the UK infringement claim, Plaintiff did the not respond substantively to that argument, and thus, summary judgment on that claim is granted. For the reasons discussed below, both parties' Motions, except for the UK infringement claim are denied as genuine issues of material fact exist.

## I.     FACTUAL BACKGROUND AND PROCEDURAL HISTORY

Northrop is a global security company providing systems, products, and solutions in autonomous systems, logistics, and modernization.  (Defendant Statement of Undisputed Facts ("Def. SUF"), ¶ 1).  Envoy is a software company that owns and licenses a product known as XIPC.  (SAC, ¶ 5.)  XIPC Data Translation Services ("DTS") is a component of XIPC software that is licensed to Envoy's customers as part of XIPC.  (SAC, ¶ 33.)  In 2005, Northrop entered into a three-year license agreement with Envoy.  Relevant to the instant motions are the facts surrounding the 2005 license agreement, as well as renewals of this agreement.  The following is a list of the various documents pertinent to the dispute at issue:

- Initial Draft Memorandum of Understanding ("Initial MOU")
- Second Draft Memorandum of Understanding ("Second MOU")
- Third Draft Memorandum of Understanding ("Third MOU")
- Draft License and Distribution Agreement
- April 7, 2005 Request for Quote ("RFQ No. 6TAJMS0507-01")
- April 7, 2005 Request for Quote ("RFQ No. 6TAJMS0507-02")
- April 8, 2005 Envoy Quote No. MO205-1750
- April 8, 2005 Envoy Quote No. MO205-1751
- April 10, 2005 Envoy Invoice No. A1405
- April 13, 2005 License Purchase Order ("PO")
- April 13, 2005 Blanket Purchase Order ("BPO")
- Terms and Conditions ("T&C")
- June 5, 2008 Purchase Order ("2008 Purchase Order")
- June 16, 2008 Envoy Invoice No. U1608
- June 13, 2009 Envoy Quote No. N/A
- March 11, 2010 Envoy Quote No. N/A
- November 30, 2010 Envoy Invoice

On February 16, 2005, Envoy's CEO, Shashi Prasad, sent a draft Memorandum of Understanding ("Memorandum of Understanding" or "MOU") to Northrop for review and discussion. (February 16, 2005 Email from Shashi Prasad to Larry Merritt *re*: "Draft MOU for Licensing of XIPC.") The initial draft MOU states that it sets forth the "principal commercial terms of a proposed License and Distribution Agreement" (Initial MOU, p. 1) which included the following breakdown of payments:

> The <u>Initial Setup Fee</u> for the Software as defined in the licensing metric is One Hundred Eighty Seven Thousand Five Hundred Dollars ($187,500.00). OEM [Northrop] will pay Ninety Thousand Dollars ($90,000.00) <u>for annual Usage Fees</u> for the term beginning April 1, 2005. The annual Usage Fees for the second year of the term beginning April 1, 2006 will be Ninety Two Thousand Seven Hundred Dollars ($92,700). The annual Usage Fees for the third year of the term beginning April 1, 2006 will be Ninety Five Thousand and Four Hundred Eighty One Dollars ($95,481). <u>Usage Fees includes charges for annual maintenance</u>. . . . For all periods subsequent to the Initial Period, invoices shall be issued on January 1 of each year and shall be payable within thirty (30) days of the date of issuance of such invoice. <u>Upon payment of the Usage Fees,</u> there shall be no further charges for annual maintenance.

(emphasis added.) (Draft License and Distribution Agreement, §2.) On February 23, 2005, Northrop responded to Envoy with revisions to its initial draft MOU in advance of a conference call. (February 23, 2005 Email from Edward Martin to Shashi Prasad *re*: "FW: Draft MOU for Licensing of XIPC.") Northrop replaced the term "usage fee" with "maintenance" throughout and left the comments "Note: Usage fee?" and "Note: I'm not comfortable with this term" in brackets. (Second MOU, pp. 1-2.) A subsequent third draft by Envoy incorporated many of Northrop's suggested tracked changes but added the text "[u]sage fees include maintenance." (Third MOU, p. 2.) On March 2, 2005, Mr. Prasad emailed Northrop's former employee responsible for procurement for the IDENT1 project, Mr. Edward Martin, indicating that "[t]he quote will be

prepared based on the terms [Envoy and Northrop] agreed [to] the other day" and referred to the fees as "Usage/Maintenance Fee[s]." (March 2, 2005 Email from Shashi Prasad to Martin Edward *re*: "RE: Draft MOU for Licensing of XIPC.")

On April 7, 2005, Northrop issued two separate Requests for Quote ("Requests for Quote or "RFQ"). (RFQ No. 6TAJMS0507-01, RFQ No. 6TAJMS0507-02.) The first RFQ was for the supply/service "EC-COR ENVOY CONNECT AND ENVOY CONNECT XIPC LICENSE" at the unit price of $187,500. (RFQ No. 6TAJMS0507-01, p. 2.) The second RFQ was for the following supplies/services: (1) "EC-CORE-USAGE 04/01/05 – 03/31/06" at the unit price of $90,000; (2) "EC-CORE-USAGE 04/01/06 – 03/31/07" at the unit price of $92,700; (3) "EC-CORE-USAGE 04/01/07 – 03/31/08" at the unit price of $95,481; and (4) "ESCROW SOURCE CODE FEES 04/01/05 – 03/31/08" at the unit price of $800. (RFQ No. 6TAJMS0507-02, p. 2.) Envoy subsequently supplied formal quotes and invoices reflecting the same prices. The formal quotes list "ec-core" and "ec-core-usage" as item codes that correspond to the descriptions, "Envoy Connect and Envoy Connect XIPC License" and "Envoy Connect/Envoy Connect XIPC Usage Fee," respectively. (Envoy Quote No. MO205-1750; Envoy Quote No. MO205-1751.)

On April 14, 2005, the parties executed two purchase orders, one related to the license (the "License Purchase Order" or "PO") and a second concerning the annual payments (the "Blanket Purchase Order" or "BPO"). The License Purchase Order states the following under the "ITEM DESCRIPTION" and "UNIT PRICE" headings:

> EC-CORE                                    187500.0000
> ENVOY CONNECT AND ENVOY CONNECT XIPC LIC
> *** Line Item Extended Description ***
> PERPETUAL UNLIMITED USE LICENSE FOR ENVOY
> CONNECT XIPC.
> PROJECT LICENSE FOR ENVOY CONNECT

(PO No. 65220L3T5C, p. 1.)  Under "ITEM NO. / DESCRIPTION" and "UNIT PRICE" the Blanket Purchase Order states:

> EC-CORE-USAGE                                    90000.0000
> ANNUAL MAINTENANCE
> *** Line Item Extended Description ***
> ANNUAL MAINTENANCE/SUPPORT POP 04/01/05-03/31/06

(BPO No. 65221L3T5A, p. 1.)  The same description text is repeated for the time periods of April 1, 2006-March 31, 2007 and April 1, 2007-March 31, 2008 with corresponding unit prices of $92,700 and $95,481, respectively.  (*Id*., at pp. 1-2.)  The last "ITEM NO. / DESCRIPTION" and "UNIT PRICE" state the following:

> ESCROW                                           800.0000
> SOURCE CODE ESCROW FEES
> *** Line Item Extended Description***
> ONE TIME PAYMENT POP 2005-2008

(*Id*. at 2.)  Both purchase orders state that the terms and conditions ("T&C"), "SHALL APPLY TO THIS ORDER."  (PO No. 65220L3T5C, p. 2; BPO No. 65221L3T5A, p. 2.)  Clause No. 32 of the terms and conditions, "license grant," states the following in pertinent part:

> Buyer shall have the right to transfer, assign or novate (as applicable) to its customer . . . all software licenses and maintenance agreements without the need for further consent, license or payment of charges . . . . Any on-going fees under those arrangements payable by Buyer's customer after such transfer, assignment or novation (as applicable) shall be consistent with and no higher than the fees payable by the Buyer prior to such transfer, assignment or novation (as applicable). (1) All software licenses to use are perpetual and irrevocable.  (2) Seller grants Buyer the right and Buyer shall have the right to grant to its customer . . . a perpetual, fully paid, non-exclusive license to use, operate, adapt, copy, maintain, support, modify and enhance such software or material.

(T&C, p. 5.) (emphasis added.)  In May 2008, the parties discussed a new purchase order for contract renewal.  On June 5, 2008, Northrop issued a purchase order (the "2008 Purchase Order") for the product "software subscription service – download" with "XIPC-MT" as the associated

vendor material number.  (PO No. 7500032255, p. 2.)  Envoy subsequently issued an invoice on June 16, 2008 for "Envoy Connect XIPC Usage Fee – from April 1, 2008 to March 31, 2009" for $127,600.  (Envoy Invoice No. U1608, p. 1.)  On April 14, 2009, Mr. Prasad sent Mr. Martin an email attaching the "updated version of the MOU" with the following additional comment at the top of the draft: "[t]his was my note after we discussed the [Northrop] edits in a conference call – we were OK with using the term usage as long as it included maintenance . . . ." (April 14, 2009 Email from Shashi Prasad to Martin Edward *re*: "FW: Envoy XIPC Licensing for Ident1/NAFIS Software – Term Ending Early Next Year".)  In June 2009, the parties discussed a proposed quote and purchase order.  Envoy indicated that while "older invoices were issued with the usage fees in the language," Envoy was "okay to change it to maintenance fees as [] see[n] in the quote" but would appreciate that "maintenance would be taken for a term (2-3 years)."  (June 11, 2009 email from Shashi Prasad to Ben Clark *re*: "RE: Envoy Technologies MOU + Proposed Quote.").  The 2009 and 2010 quotes from Envoy are labelled "Northrop Grumman Quote for Yearly Usage" and contain the item code "XIPC usage" but state "Envoy XIPC Maintenance Fees" in the description corresponding to the item code.  (June 13, 2009 Envoy Quote, p. 1; March 11, 2010 Envoy Quote, p. 1.)  An Envoy invoice dated November 30, 2010, includes "Envoy XIPC Maintenance Fees from April 1, 2011 to March 31, 2012" in the description," but also states "[p]er Agreement, the usage fees for the billing term were increased 10% from the 2010 term."  (Nov. 30, 2010 Envoy Invoice, p. 1.)  Email correspondence from early 2011 shows concern among Northrop employees over the cost of increasing annual XIPC fees.  (*See, e.g.*, Feb. 3, 2011 Email from Nicholas Woolheater to Martin Edward, *et al*. *re*: "RE: EXTERNAL: Resending this email – please confirm receipt and if this is OK.")  On February 24, 2011, Northrop represented over correspondence that it would "not be renewing Envoy XIPC due to new cost restraints."  (Feb. 24, 2011 Email from

Edward Martin to Shashi Prasad *re*: "Shopping Cart Number: 0012166629 – Approved.")  Envoy subsequently confirmed the following in an email from March 10, 2011:

> It was made clear that Northrop Grumman did not just stop paying for maintenance but a project to replace XIPC is underway and progressing nicely.  [Northrop] also conveyed that the use of Envoy XIPC will cease by June 2011.  [Envoy] will send out a letter confirming the same to [Northrop] in the next couple of days.

(March 10, 2011 Email from Shashi Prasad to Edward Martin *re*: "Shopping Cart Number: 0012166629 – Approved.")  Thereafter, Plaintiff contends that 2018 correspondence between Envoy and Northrop revealed that Northrop had continued to use XIPC for many years after the parties' last renewal lapsed in 2011.  (Pl.'s Brief in Opposition to Def.'s Motion for Summary Judgment and in Support of Pl.'s Cross Motion ("Pl. Br."), p. 10.)  The instant lawsuit commenced after the parties failed to negotiate a resolution.

As noted *supra*, on April 30, 2020, I granted Defendant's Motion to Dismiss as to Plaintiff's initial claims for fraud, misappropriation, unjust enrichment, and improperly pled claims under United Kingdom law, but denied Defendant's motion as to the infringement and breach of contract causes of action.  (ECF No. 35.)  With respect to Defendant's infringement claim, I found that Plaintiff sufficiently pled ownership over a valid, registered interest in XIPC. (*Id*. at 6-8.)  I further found that Plaintiff's fraud, misappropriation, and unjust enrichment claims were preempted by the Copyright Act as they were duplicative of Defendant's infringement claim. (*Id*. at 17-21.)  Regarding Plaintiff's breach of contract claim, however, I explained that Plaintiff alleged an additional element beyond unauthorized reproduction and use, *i.e.*, a promise to pay for continued use, which circumvented preemption.  (*Id*. at 15-16.)  After finding that preemption did not apply, the salient issue now before the Court is whether the parties indeed agreed to certain payment obligations in connection with continued use of the licensed XIPC software.

## II.    DISCUSSION

### A.  STANDARD OF REVIEW

Summary judgment is appropriate where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). An issue is "genuine" when "a reasonable jury could return a verdict for the non-moving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, (1986). A fact is "material" only if it has the ability to "affect the outcome of the suit under governing law." *Kaucher v. Cty. of Bucks*, 455 F.3d 418, 423 (3d Cir. 2006) (citation omitted.) Disputes over irrelevant or unnecessary facts will not preclude a grant of summary judgment. *Anderson*, 477 U.S. at 248.

"In considering a motion for summary judgment, a district court may not make credibility determinations or engage in any weighing of the evidence." *Marino v. Indus. Crating Co.*, 358 F.3d 241, 247 (3d Cir. 2004); *see also Conboy v. United States Small Bus. Admin*., 992 F.3d 153, 160 (3d Cir. 2021) (citing *Marino v. Indus. Crating Co.*, 358 F.3d at 247). Instead, the court must construe all facts and inferences in the light most favorable to the nonmoving party. *See Boyle v. Cty. of Allegheny Pa.*, 139 F.3d 386, 393 (3d Cir. 1998). The moving party bears the burden of showing that no genuine issue of material fact exists. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). "If the moving party will bear the burden of persuasion at trial, that party must support its motion with credible evidence ... that would entitle it to a directed verdict if not controverted at trial." *Id.* at 331. However, where the nonmoving party will carry the burden of persuasion at trial, the party moving for summary judgment may satisfy Rule 56's burden of production by either (1) "submit[ting] affirmative evidence that negates an essential element of the

nonmoving party's claim" or (2) demonstrating "that the nonmoving party's evidence is insufficient to establish an essential element of the nonmoving party's claim." *Id.* Once the movant adequately supports its motion under Rule 56(c), the burden shifts to the nonmoving party to "go beyond the pleadings and by her own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial." *Id.* at 324; *see also Bickle v. Seiberling*, 87 Fed. Appx. 816, 818 (3d Cir. 2004). If there are no issues that require a trial, judgment as a matter of law is appropriate.

### B.  BREACH OF CONTRACT

Both Defendant and Plaintiff move for summary judgment on Plaintiff's breach of contract claim. Under New Jersey law,[1] a breach of contract claim requires proof of three elements: (1) the existence of a valid and enforceable contract, (2) a breach of that contract, and (3) damages. *See Murphy v. Implicito*, 392 N.J. Super. 245 (App. Div. 2007). Summary judgment on a contract claim is appropriate where the contract language is unambiguous—*i.e.*, "subject to only one reasonable interpretation." *See Mylan Inc. v. SmithKline Beecham Corp.*, 723 F.3d 413, 418 (3d Cir. 2013) (quoting *Arnold M. Diamond, Inc. v. Gulf Coast Trailing Co.*, 180 F.3d 518, 521 (3d Cir.1999)); *see also Tamarind Resort Associates v. Government of Virgin Islands*, 138 F.3d 107, 110-11 (3d Cir. 1998). The issue of whether the language of a contract is ambiguous is a matter of law. *American Eagle Outfitters v. Lyle & Scott Ltd.*, 584 F.3d 575, 587 (3d Cir. 2009) ("As a preliminary matter, courts must determine as a matter of law which category written contract terms fall into—clear or ambiguous") (internal quotations and citations omitted.) Conversely, a term is "ambiguous if it is subject to reasonable alternative interpretations." *Fleisher v. Standard Ins. Co.*,

---

[1] The Terms and Conditions state that "[t]his purchase order, and the acceptance thereof, shall be governed by and construed in accordance with the laws of the State of New Jersey, USA." (T&C, Cl. No. 18.) The Parties do not dispute that New Jersey law applies.

679 F.3d 116, 121 (3d Cir. 2012) (quoting *Taylor v. Cont'l Group Change in Control Severance Pay Plan*, 933 F.2d 1227, 1232 (3d Cir. 1991).  If the nonmoving party submits "a reasonable alternative reading of the contract, then a question of fact as to the meaning of the contract exists which can only be resolved at trial."  *Newport Assocs. Dev. Co. v. Travelers Indem. Co.*, 162 F.3d 789, 792 (3d Cir. 1998).

Here, Defendant argues that it paid a one-time license fee of $187,500, in 2005 for a perpetual, irrevocable license to use Envoy's XIPC software, and three years of annual maintenance.  (Def.'s Brief in Support of Summary Judgment ("Def. Moving Br."), pp. 4-5.) Plaintiff responds that notwithstanding Northrop's purchase of a perpetual, irrevocable license, the agreed upon compensation included a one-time, initial "Setup" or "License" Fee of $187,500 in addition to annual usage fees including maintenance for each year of use. (Pl. Br., pp. 1-2.)  I now turn to the contractual documents to determine the appropriate interpretation of the terms of the original and renewed agreements.

I start with the terms and conditions of the 2005 agreement.  The gist of Defendant's argument is that it purchased a fully paid license from Plaintiff under which it received perpetual, unlimited use of Envoy's XIPC software.  (Def.'s Reply in Support of its Motion for Summary Judgment and Opposition to Plaintiff's Cross Motion ("Def. Reply"), pp. 4-8.)  For support, Defendant points to Clause 32, which states that "[a]ll software licenses to use are perpetual and irrevocable."  (T&C, Cl. 32.)  Further, Defendant maintains that the Clause provides that "'Seller grants Buyer the right' to 'a perpetual, fully paid, non-exclusive license to use . . . such software.'" (Def. Reply, p. 4.)  I do not find that the language of this clause definitively supports Defendant's interpretation, because Defendant omits a portion of the clause that substantially changes the meaning.  Indeed, Clause 32 discloses that "Seller grants Buyer the right and Buyer shall have the

right *to grant to its customer* . . . a perpetual, fully paid, non-exclusive license to use." (T&C, Cl. 32.) (emphasis added.) It does not stipulate that Seller grants *Buyer* the right to a fully paid license.

Next, Clause 32 permits Buyer the right to "transfer, assign or novate (as applicable)" to any "third party as designated by Buyer or Buyer's customer all *software licenses and maintenance agreements* without the need for further consent, license or payment . . . . Any on-going fees under those arrangements payable by Buyer's customer after such transfer, assignment or novation (as applicable) shall be consistent with and no higher than *the fees payable by the Buyer* prior to such transfer, assignment or novation (as applicable)." (emphasis added.) Plaintiff argues that this language indicates that Clause 32 contemplates the payment of ongoing licensing fees, while Defendant takes the position that the contract "merely refers to 'any ongoing fees' that might exist, such as under the expressly contemplated 'maintenance agreements.'" (Def. Reply, p. 4.) I find this term ambiguous. Indeed, the clause discusses "fees payable by the Buyer" prior to any transfer, assignment, or novation of such software license to a third party. (T&C, Cl. 32.) However, it does not clearly identify the nature of any fees, maintenance or otherwise. As such, I cannot adopt either party's interpretation. Rather, because of the agreement's ambiguous nature, I must consider it together with the 2005 purchase orders to ascertain the parties' intention. *See Barco Urban Renewal Corp. v. Housing Auth. of Atlantic City*, 674 F.2d 1001, 1009 (3d Cir.1982) ("A writing is interpreted as a whole and all writings forming part of the same transaction are interpreted together.") (citing Restatement (Second) of Contracts § 202(2) (1981)).

The initial License Purchase Order purchased "EC-CORE ENVOY CONNECT AND ENVOY CONNECT XIPC LIC" for the unit price of $187,500. (PO No. 65220L3T5C, p. 1.) Under the "Line Item Extended Description," the PO states "PERPETUAL UNLIMITED USE LICENSE FOR ENVOY CONNECT XIPC. PROJECT LICENSE FOR ENVOY CONNECT."

(*Id*.)  It is evident from the PO that Northrop purchased a perpetual, unlimited use license for the XIPC software.  Defendant argues that this "unlimited" use license permitted Northrop to continue to use XIPC software free of further charges for usage fees.  (Def. Reply, p. 4.)  Conversely, Plaintiff avers that a perpetual and irrevocable license does not negate the requirement of ongoing payments.  (Pl. Br., p. 10.)  The existence of the Blanket Purchase Order lends support to Plaintiff's position.

Indeed, the BPO on its face, contrary to the PO, indicates that Plaintiff did not purchase a license free of further charges, but the terms nevertheless do not resolve the dispute.  On the one hand, under "ITEM No. / DESCRIPTION" the BPO states "EC-CORE-USAGE" with the unit price of $90,000 on the same line.  (BPO No. 65221L3T5A, p. 1.)  This text, alone, suggests that Northrop purchased one year of "usage" for $90,000.  However, the words "ANNUAL MAINTENANCE" appear underneath this text and the "Line Item Extended Description" states "ANNUAL MAINTENANCE/SUPPORT POP 04/01/05-03/31/06."  (*Id*.)  As noted *supra*, the entire item appears as follows:

```
ITEM NO. / DESCRIPTION    ECL           UNIT PRICE
-------------------------------------------------------------------------
EC-CORE-USAGE                            90000.0000
ANNUAL MAINTENANCE
*** Line Item Extended Description ***
ANNUAL MAINTENANCE/SUPPORT POP 04/01/05 03/31/06
```

(*Id*.)  The same text repeats two more times throughout the BPO with increased unit prices listed for the subsequent years of 2006 and 2007.  (*Id*. at 1-2.)  Plaintiff argues that "ANNUAL MAINTENANCE" appears under "EC-CORE-USAGE" with no price next to it because maintenance was to be provided at no extra cost with the payment of the usage fee.  (Pl. Br., p. 6.)  Defendant insists that "EC-CORE-USAGE" is merely an "item-code" and "ANNUAL MAINTENANCE" is the relevant description for the item code.  (Def. Reply, pp. 5-6.)  I cannot

credit either party's position, because while the terms and conditions mention "maintenance agreements" and the extended line item descriptions include "annual maintenance," the reference to "usage" on the same line as the unit price creates ambiguity.   In considering the purchase orders together with the terms and conditions, I find that the BPO and PO do not shed any more light on the ambiguity of the 2005 contract concerning the provision that may or may not require Defendant to remit usage fees for any future use.

In attempting to resolve ambiguities in a contract, courts may consider extrinsic evidence. Although such evidence is not permitted to modify or curtail the terms of an agreement, a court may "consider all of the relevant evidence that will assist in determining the intent and meaning of the contract." *Conway v. 287 Corp. Ctr. Assocs.*, 187 N.J. 259, 269, 901 A.2d 341, 346 (2006); *Teamster Indus. Employees Welfare Fund v. Rolls–Royce Motor Cars, Inc.*, 989 F.2d 132, 135 (3d Cir. 1993) (noting that courts must consider contract language, meanings suggested by counsel, and extrinsic evidence in deciding whether a contract is ambiguous.)   Extrinsic evidence may include the structure of the contract and the bargaining history, as well as the conduct of the parties that reflects their understanding of the contract's meaning. *Teamster Indus. Employees Welfare Fund*, 989 F.2d at 135.

Here, extrinsic evidence also does not resolve the ambiguity created by the terms and conditions and purchase orders.  Plaintiff points to a Memorandum of Understanding, requests for quote, quotes, invoices, and emails in support of its interpretation that the annual fees were usage fees.  Although it appears that the latest version of the MOU included the language "usage fees include maintenance" inserted by Envoy, it does little to demonstrate *both* parties' intent as the draft

MOU was never formally executed.[2] (Third Draft MOU, p. 2.) The 2005 Northrop RFQ lists "EC-CORE-USAGE" under "supplies/services." (RFQ No. 6TAJMS0507-02, p. 2.) Moreover, the April 2005 Envoy Quote describes the "Item Code" "ec-core-usage" as "Envoy Connect/Envoy Connect XIPC Usage Fee" for years one through three.[3] (Envoy Quote No. MO205-1751.). Additionally, Northrop paid Envoy an invoice for "ec-core-usage" and "escrow" described as follows:

> Envoy Connect and Envoy Connect XIPC Usage Fee – Year 1 –
> April 1, 2005 to March 31, 2006
> Envoy Connect and Envoy Connect XIPC Usage Fee – Year 2 –
> April 1, 2006 to March 31, 2007
> Envoy Connect and Envoy Connect XIPC Usage Fee – Year 3 –
> April 1, 2007 to March 31, 2008
> Source Code Escrow Fees from 2005 through 2007

(Envoy Invoice No. A1405, p. 1.) Indeed, none of these documents mention maintenance. However, while the invoice associated with the 2008 Purchase Order is for "Envoy Connect *XIPC Usage Fee* – from April 1, 2008 to March 31, 2009," (Envoy Invoice No. U1608) (emphasis added) the 2008 Purchase Order is for "Software Subscription Service – Download" and includes "*XIPC-MT*" as the vendor material number. (PO No. 7500032255, p. 2.) (emphasis added.) The vendor material number "XIPC MT" supports a plausible interpretation of the 2008 Purchase Order as payment for a maintenance fee. Adding to the confusion, the 2009 and 2010 quotes contain the

---

[2] Plaintiff claims that the MOU is binding. (Pl. Br., p. 13.) I disagree. Although Plaintiff cites an April 14, 2009 email in which Mr. Prasad attaches an updated version of the MOU and claims "[the parties] had finalized on the [2005] call prior to issuing the invoice/PO" (April 14, 2009 Email from Shashi Prasad to Martin Edward *re*: "FW: Envoy XIPC Licensing for Ident1/NAFIS Software – Term Ending Early Next Year"), days earlier Mr. Prasad wrote to Mr. Martin that he would "try to find out the work in progress MOU that was never finalized." (April 10, 2009 Email from Shashi Prasad to Edward Martin *re*: "RE: PR30198482.") Furthermore, each draft of the MOU contains the header, "DRAFT – FOR DISCUSSION PURPOSES ONLY."
[3] The court notes that the BPO references this quote under the "trailer comments" as "REFERENCE QUOTATION. MO205-1751." (BPO No. 65221L3T5A, p. 4.)

description "Envoy XIPC Maintenance Fees" on the same line as "xipc-usage." (June 13, 2009 Envoy Quote, p. 1; March 11, 2010 Envoy Quote, p. 1.) Accordingly, none of the text of the POs, quotes, or invoices shed light on the subject.

Email correspondence and testimony also fall on both sides. Plaintiff cites two emails from Northrop employees in support of its understanding of the parties' contractual agreement. An internal Northrop email dated December 8, 2010, states that "even though [XIPC] is labeled a 'maintenance' renewal, it is really a usage fee for the product. If [Northrop] drop[s] this 'maintenance', [Northrop] [is] not entitled to use XIPC . . . ." (December 8, 2010 Email from Corey Ezersky to Edward Martin, *et al*. *re*: "RE:EXTERNAL: Resending this email – please confirm receipt and if this is OK.") On February 18, 2011, Mr. Martin wrote to another Northrop employee that if "[Northrop] do[es]n't renew, [Northrop] cannot use the product." (February 18, 2011 Email from Edward Martin to Richard J Hundemer *re*: "RE: Envoy renewal 30534397.")

Defendant responds with correspondence from Envoy employees and testimony from Mr. Martin. Specifically, Defendant cites an April 2008 email chain between Northrop and Envoy in which Ms. Gloria Fahrenthold, a subcontract administrator at Northrop, asked Ms. Lynn Iacona, a secretary at Envoy, whether the fee was "a maintenance or a right-to-use license fee?" (April 14, 2008 Email from Gloria Fahrenthold to Lynn Iacona *re*: "RE: PR30198482.") Ms. Iacona responded that "[it] is a Maintenance renewal." (April 15, 2008 Email from Lynn Iacona to Gloria Fahrenthold "RE: PR30198482.) After receiving a subsequent email from Ms. Fahrenthold inquiring regarding the price, Mr. Prasad instructed Ms. Iacona to "[t]ell [Northrop] the terms of the project license was agreed earlier – latest being in 2005 for XX with maintenance for each of the 3 yrs at XX, YY and ZZ . . . . As a continuation of the maintenance it is 10% higher than ZZ." (April 18, 2008 Email from Shashi Prasad to Lynn Iacona *re*: "Re: PR30198482.") On May 6,

2008, Mr. Martin also emailed Ms. Iacona, copying Mr. Prasad, asking whether the renewal was a "Maintenance renewal or a Subscription (usage) renewal?"  (May 6, 2008 Email from Martin Edward to Lynn Iacona *re*: "RE: PR30198482.")  Mr. Prasad responded the same day, as follows:

> Under the old agreement this was recorded as maintenance.  [The parties] had discussed the terms and then [Envoy] had created a new OEM agreement which was never signed. Under the new agreement/MOU this was called usage fees. Please refer to the MOU that was sent couple of days ago.

(May 6, 2008 Email from Shashi Prasad to Martin Edward and Lynn Iacona *re*: "RE: PR30198482.")  Mr. Martin replied to Mr. Prasad indicating that "[Northrop] will use the MOU [Envoy] ha[s] provided for the Envoy support as [the parties] go forward" and in discussing the price quotes from Envoy, refers to the fees as "usage fee[s]."  (May 6, 2008 Email from Martin Edward to Shashi Prasad and Lynn Iacona, *re*: "RE: PR30198482.")  However, at Mr. Martin's deposition, he testified that Northrop "purchased a professional unlimited use license for Envoy connect XIPC" and "three years of payments for the maintenance of the XIPC license."  (Martin Dep. Tr., 57:19-24.)  Additionally, when asked whether it was his understanding that if Northrop did not renew, it could not use Envoy's product, Mr. Martin testified that he was "just buying off the phone" and "extending what [he] was told by Mr. Prasad."  (*Id*. at 59:15-18.)  Finally, Defendant also cites a June 2009 email from Mr. Prasad in which he agreed to remove all references to usage fees in a quote, (June 14, 2009 Email from Shashi Prasad to Ben Clark *re*: "RE: Envoy Technologies MOU + Proposed Quote) and a March 2011 internal Envoy email in which Mr. Prasad relays that "[a]t this point [Northrop] has no money to have maintenance of 280k+ annually but cannot afford to have a COTS product without support [and] [a]s a result, [] will stop using XIPC in the next few months."  (March 10, 2011 Email from Shashi Prasad to Lynn Iacona and Sanjay Shrivastava *re*: "Re: IDENT1 and Northrop Grumman – Status Update.")  These emails

support Defendant's view that annual payments were strictly for maintenance or support for the XIPC computer software product.  Having considered the extrinsic evidence offered in support of each interpretation, I find that the evidence does not resolve the ambiguity in the contract such that no reasonable jury could find for Plaintiff or Defendant.  On the one hand, early quotes and paid invoices clearly state "XIPC usage fee" and the third draft of the MOU includes the text "[u]sage fees include maintenance."  (Third MOU, p. 2.)  Additionally, correspondence among Northrop employees suggest that Northrop understood it could no longer use the XIPC software without future payment.   However, the evidence also shows that Northrop preferred the term "maintenance" and Envoy accepted the use of this term in the most recent quotes from 2009 and 2010.  (*See* June 13, 2009 Envoy Quote, p. 1; March 11, 2010 Envoy Quote, p. 1.)  What is more, as discussed *supra*, Envoy even used the term maintenance in internal correspondence.  No other evidence before the Court reconciles these differences.  Therefore, this presents a factual issue that must be decided by a jury.  *See Peck v. Donavan*, No. 07-5500, 2010 WL 4628198, at *2 (D.N.J. Nov. 4, 2010) ("Although the construction of a written contract is usually a matter for the court, where its meaning is 'uncertain or ambiguous and depends upon parol evidence admitted in aid of interpretation, the meaning of the doubtful provision should be left to the jury") (internal quotations and citations omitted.)

### C. COPYRIGHT

Defendant argues that it is entitled to summary judgment on Plaintiff's copyright claims on the grounds that Envoy cannot prove that it registered DTS with the Copyright Office and Northrop granted Envoy an express license to use XIPC.  The Court addresses each argument, in turn.  To establish a claim of copyright infringement, a plaintiff must show: (1) ownership of a valid copyright; and (2) unauthorized copying of original elements of the plaintiff's work.

*Tanksley v. Daniels*, 902 F.3d 165, 172-73 (3d Cir. 2018) (citing *Dun & Bradstreet Software Servs., Inc. v. Grace Consulting, Inc.*, 307 F.3d 197, 206 (3d Cir.2002)). Certificates of registration issued by the U.S. Copyright Office constitute *prima facie* evidence of the ownership of the material. *Ford Motor Co. v. Summit Motor Prod., Inc.*, 930 F.2d 277, 290-91 (3d Cir. 1991). Copying is a "shorthand reference to the act of infringing any of the copyright owner's five exclusive rights set forth at 17 U.S.C. § 106." *Dun & Bradstreet Software Servs., Inc.*, 307 F.3d at 206 (3d Cir. 2002) (quoting *Ford Motor Co.*, 930 F.2d at 291.)

At the outset, the Court finds no genuine material issue concerning the registration of the deposit material. This is not a case of a plaintiff attempting to "enforce a copyright in work X" where it has clearly "deposited a copy of work Y." *Gallup, Inc. v. Kenexa Corp.*, 149 Fed. App'x, 94, 95-96 (3d Cir. 2005) (citing examples in which work Y was either a reconstruction of work X or a later version of work X). Rather, Defendant argues that it is not possible to determine whether Plaintiff is seeking to enforce a copyright in the same work that was deposited with the Copyright Office, because Envoy cannot demonstrate that source code for DTS, the XIPC component Envoy asserts Northrop used without Envoy's permission, was ever deposited with the Copyright Office, without a copy of the original materials deposited. (Def. Moving Br., p. 16.) As an initial matter, Envoy claims that Northrop used all of XIPC, not merely the DTS component, up until at least 2012. (Pl.'s Reply in Support of Motion for Summary Judgment ("Pl. Reply"), p. 14.). Northrop does not contest the registration documentation for XIPC.[4] Therefore, there is no proof of registration issue that precludes Envoy's copyright claim as it pertains to XIPC. Regarding DTS specifically, Envoy responds that XIPC version 2.8 was properly received and accepted by the

---

[4] The registration documentation for XIPC version 2.8 indicates that the deposit for version 2.8 was received by the Copyright Office on June 14, 1999. (*See* June 14, 1999 Copyright Registration Form TX, p. 1.)

Copyright Office and the source code file listing for version 2.8, among other versions[5], includes all of the DTS software files. (*See* June 14, 1999 Copyright Registration Form TX, p. 1; Plaintiff's Reply Statement of Undisputed Material Facts ("Pl. SUF"), ¶ 36) (citing Source Code File Listing, XIPC Version 2.8.))

To begin, both parties acknowledge that the Copyright Office no longer possesses a copy of the materials that were deposited in 1999. (*See* April 9, 2021 Email from US Copyright Office *re*: "RE: Deposit Copies Request.") ("[T]he works in your request are out of our retention period and are no longer part of the Copyright Office collection.") Indeed, the Copyright Office generally retains deposit copies only "for the longest period considered practicable and desirable by the Register of Copyrights and the Librarian of Congress," 17 U.S.C. § 704(d), after which it is within the joint discretion of the Register and Librarian to order their destruction or other disposition. *See Design Basics, LLC v. Forrester Wehrle Homes, Inc.*, No. 15-00666, 2018 WL 1583103, at *9 (N.D. Ohio Mar. 30, 2018) (finding twenty to thirty-year-old copyrights well past the retention period and lack of deposit copies on file most likely due to ordered destruction or other disposition).

Mr. Prasad also admitted that Envoy does not own an identical copy of the original XIPC deposit materials from 1999. (*See* Prasad Dep. Tr., 194:6-9 ("Q. Envoy doesn't have a copy of any materials that have been deposited with the United States Copyright Office, correct? A. No, we do not do that.")) However, Plaintiff represents that it possesses the same XIPC version 2.8 that was deposited with the Copyright Office in 1999. (*See* Pl. SUF, ¶ 36 (citing CD-ROM labeled "XIPC SOURCE, 250, 280, 302, GOLD"; June 14, 1999 Copyright Registration Form TX, p. 1).)

---

[5] Plaintiff claims that Defendant used XIPC version 3.3 after 2011 and that the code file listing for version 3.3 is substantially identical to version 2.8. (*See* Decl. of Sanjay Shrivastava, ¶ 10.)

Defendant disputes this representation because, according to Defendant, not every copy of XIPC included DTS code as part of the release.  (Def. Moving Br., p. 16; Prasad Dep. Tr., 194:13-17; 95:19-23; 163:1-4.)  But, the fact that some customers were later supplied XIPC software without DTS, is insufficient to infer, without additional evidence, that the XIPC deposit at the Copyright Office did not include DTS.  Rather, Defendant's position is based in speculation.  "[S]peculation and conjecture may not defeat a motion for summary judgment."  *Wharton v. Danberg*, 854 F.3d 234, 244 (3d Cir. 2017) (quoting *Acumed LLC v. Advanced Surgical Servs., Inc.*, 561 F.3d 199, 228 (3d Cir. 2009)); *Halsey v. Pfeiffer*, 750 F.3d 273, 287 (3d Cir. 2014) ("An inference based on a speculation or conjecture does not create a material factual dispute.")

Having reviewed the registration for version 2.8 and a recently retrieved copy of the source code file listing of XIPC version 2.8 with DTS software files[6], I find that Northrop has failed to produce any evidence calling into question the contents of the deposited source code.  *Cf. Geoscan, Inc. of Tex. v. Geotrace Techs., Inc.*, 226 F.3d 387, 393 (5th Cir.2000) (finding on summary judgment that plaintiff had not fulfilled statutory requirements necessary to register its copyright and to claim ownership for purposes of copyright infringement claim where deposit was not a complete copy of the original source codes but instead consisted of later versions).  Accordingly, I find no material issue as to the registration of XIPC or its DTS component.

With respect to the second element of a copyright claim, unauthorized copying, it is undisputed that a valid license may defeat a copyright infringement claim.  *See Sony Corp. v. Universal City Studios, Inc.*, 464 U.S. 417, 433 (1984) ("anyone who is authorized by the copyright

---

[6] Plaintiff claims that it possesses a full copy of XIPC version 2.8, among other versions, and has submitted a photograph of a CD-ROM titled "XIPC Source."  (*See* CD-ROM labeled "XIPC SOURCE, 250, 280, 302, GOLD.")  Although the Court has not reviewed the source code itself, it is apparent from the source code file listing that XIPC version 2.8 contained DTS software files.

owner to use the copyrighted work in a way specified in the statute . . . is not an infringer of the copyright with respect to such use."); *Peer Int'l Corp. v. Pausa Recs., Inc.*, 909 F.2d 1332, 1338 (9th Cir. 1990).

Here, Defendant argues that no infringement occurred because Northrop had an express license to use the XIPC software. (Def. Moving Br., 14.) As discussed, *supra*, the parties disagree over whether Northrop was permitted to continue to use XIPC and its components after the parties' last agreement expired in 2011. And, because the question of unauthorized use in the copyright context similarly hinges on the genuine material dispute over whether further payments were required for continued use of the XIPC software in the breach of contract context, summary judgment on the copyright claim under U.S. law is not warranted for either party.

The Court also finds that because Plaintiff failed to respond to Defendant's arguments concerning infringement under United Kingdom copyright law, Plaintiff's UK copyright claim is waived. As a general rule, "[w]here a plaintiff has brought a cause of action which is challenged through motion for summary judgment as legally insufficient, it is incumbent upon the plaintiff to affirmatively respond to the merits of a summary judgment motion." *Daughtry v. Fam. Dollar Stores, Inc.*, No. 09-5111, 2011 WL 601270, at *8 (D.N.J. Feb. 16, 2011) (quoting *Skirpan v. Pinnacle Health Hosps.*, No. 07–1703, 2010 WL 3632536, at *6 (M.D. Pa. Apr. 21, 2010)); *see also Brenner v. Twp. of Moorestown*, No. 09-219, 2011 WL 1882394, at *11 (D.N.J. May 17, 2011) (noting that "a plaintiff's failure to respond to the defendant's arguments on summary judgment constitutes an abandonment of these causes of action and essentially acts as a waiver of these issues") (internal quotation and citation omitted). Here, although Plaintiff refers to the copyright claims together in cursory fashion, there is no independent discussion of the United Kingdom copyright claim by Plaintiff. It is not the Court's responsibility to sift through the record

21

to make arguments for plaintiffs.  *See DeShields v. Int'l Resort Properties Ltd.*, 463 F. App'x 117, 120 (3d Cir. 2012) (noting that "judges are not like pigs, hunting for truffles buried in briefs" (internal quotation omitted)).  Therefore, I find that Plaintiff has abandoned its copyright claim under UK law, and it therefore must be dismissed.

### III.    CONCLUSION

For the foregoing reasons, the parties' cross motions for summary judgment are **DENIED**; except that Defendant's motion for summary judgment on the UK infringement claim is **GRANTED**.

**DATED**: March 22, 2022

/s/ Freda L. Wolfson
Hon. Freda L. Wolfson
U.S. Chief District Judge